803 So.2d 1001 (2001)
Anita DUMAS
v.
The CITY OF NEW ORLEANS, Sergeant Joan M. Alexander, Detective Kenneth Meistchovich, Detective James Sievers and Lt. Teddy Daigle.
No. 2001-CA-0448.
Court of Appeal of Louisiana, Fourth Circuit.
December 5, 2001.
*1003 Al Ambrose Sarrat, Darleen M. Jacobs, Jacobs & Sarrat, New Orleans, LA, Counsel for Plaintiff/Appellant.
Annabelle H. Walker, Deputy City Attorney, Franz L. Zibilich, Chief Deputy City Attorney, Mavis S. Early, City Attorney, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Judge STEVEN R. PLOTKIN, Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY.
Judge STEVEN R. PLOTKIN.
Defendants, City of New Orleans and New Orleans Police Department ("NOPD") Sergeant Joan Alexander (hereinafter referred to collectively as "the City"), appeal a trial court judgment in favor of plaintiff, Dr. Anita Dumas, awarding Dr. Dumas $200,000 in damages for false arrest. The City challenges the trial judge's findings on both liability and damages. We affirm.

FACTS
On April 23, 1993, Dr. Dumas, principal of John F. Kennedy High School in the City of New Orleans, was arrested by Sergeant Alexander, acting in her capacity as supervisor in the NOPD Child Abuse Section. The arrest occurred at the school sometime between 10:30 and 11 a.m. Sergeant Alexander charged Dr. Dumas with violation of LSA-R.S. 14:403(A)(2), relative to obstruction of procedures for investigating sexual abuse of a child, among other things. The City claims that Dr. Dumas violated that law by refusing to release a student to Child Abuse personnel. Dr. Dumas claims that her refusal to release the child was based on the failure of NOPD personnel to comply with New Orleans Parish School Board policy relative to providing documentation prior to the release of children to persons other than parents or guardians. Dr. Dumas was taken to New Orleans Central Lockup, where she was fingerprinted and photographed, then released on her own recognizance between 2 and 2:30 p.m. The Orleans Parish District Attorney eventually dismissed the charges against Dr. Dumas.
Dr. Dumas filed suit against the City, Sergeant Alexander, and other officers involved in the arrest, claiming false arrest. However, during trial, Dr. Dumas released all defendants except the City and Sergeant Alexander. Following the trial in the matter, the trial judge found that "when Sergeant Alexander arrived on the scene, her purpose was not to achieve access to the child but rather to arrest Dr. Dumas ... for no good reason whatsoever." The trial judge found that the consequences to Dr. Dumas were "horrendous," and awarded her $100,000 in general damages, plus $100,000 in lost wages. The City appeals.

LIABILITY
In order for a plaintiff to recover for false arrest, he must prove that he was unlawfully detained by the police against his will. Harrison v. State Through Dept. of Public Safety and Corrections, 97-1086, p. 7 (La.1998), 721 So.2d 458, 461. Thus, two elements are required to prove a case in false arrest and imprisonment: (1) detention of a person, and (2) unlawfulness of the detention. Hughes v. Gulf International, 593 So.2d 776, 780 (La.App. 4 Cir. 1992). In the instant case, Dr. Dumas was clearly detained; in fact, she was taken to Central Lockup where she was fingerprinted and photographed. Moreover, the trial judge implicitly found that the detention was unlawful when he concluded that Sergeant Alexander had arrived at the school solely for the purpose of arresting Dr. Dumas "for no good reason whatsoever." Thus, the trial judge found that Sergeant Alexander had no probable cause to arrest Dr. Dumas. The question before *1004 this court is whether the trial judge was manifestly erroneous in finding that Sergeant Alexander's arrest of Dr. Dumas was "for no good cause whatsoever."
Although the standard of review for factual findings of a trial court has been repeatedly stated by Louisiana courts, it bears repeating under the circumstances of the instant case. The Louisiana Supreme Court recently addressed this issue in Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201 (La.10/19/99), 748 So.2d 417, as follows:
It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Lirette v. State Farm Ins. Co., 563 So.2d 850, 852 (La.1990); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, supra at 844-45. But where such factors are not present, and a fact-finder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.

Id. at 6-7, 748 So.2d at 421.
It is difficult to imagine a case in which the judgment could be more based on credibility decisions than the instant case. The versions of events preceding Dr. Dumas's arrest by Sergeant Alexander presented by Dr. Dumas's witnesses consistently contradicted the version presented by the City's witnesses on many key questions.
For example, the City asserted that, prior to Sergeant Alexander's arrival at the school, Dr. Dumas had effectively denied access to the child in question to two different persons associated with the NOPD Child Abuse Divisiona social worker and Child Abuse Detective James Sievers. The City further claims that the social worker had been directly denied access, and that Detective Sievers had been effectively denied access because he was forced to wait in the office for an unreasonable period of time to talk to administrators. However, Dr. Dumas's witnesses indicated that it was Assistant Principal Richard Jackson who had dealt with the social worker, and who Detective Sievers was waiting to see.
More importantly, the City's witnesses stated that they identified themselves as NOPD personnel and produced proper identification to support their request to remove the child in question from school. However, Dr. Dumas's witnesses testified that none of the persons requesting release of the child identified themselves as NOPD personnel. Moreover, according to Dr. Dumas's witnesses, the only person who showed any type of identification was the social worker, and the secretary who talked to her stated that the card she produced looked like a School Board identification card. Because all NOPD Child Abuse Division personnel involved in the *1005 incident were dressed in "street clothes," Dr. Dumas's witnesses indicated that they were unable to identify them as police officers. Further, Dr. Dumas stated that she was unaware of the identity of the NOPD personnel until she was placed under arrest.
Another point of controversy between the two versions of the events leading up to Dr. Dumas's arrest is whether the NOPD personnel expressed a willingness to provide the proper documentation to support release of the student. The City's witnesses claim they were never shown any forms and did not know they needed to complete forms, while Dr. Dumas's witnesses indicated that the NOPD personnel were unwilling to follow proper procedures. Dr. Dumas further indicated that School Board policy required that the child's parents or guardians be contacted prior to release of the child to someone else; however, the City asserts that that requirement was inappropriate under the circumstances of their investigation in this case because the child sexual abuse perpetrator they were investigating was the natural son of the child's foster parents. Because the child was officially a ward of the State, she should have been immediately released to NOPD officials, the City implies, even in the absence of compliance with School Board policy.
Perhaps of greatest importance to this court's determination of whether the trial judge was manifestly erroneous in finding that Sergeant Alexander had "no good cause whatsoever" to arrest Dr. Dumas is the testimony concerning the events that occurred when NOPD personnel confronted Dr. Dumas in her office. The City's witnesses testified that they entered Dr. Dumas's office in a very professional manner, seeking to resolve the issue. According to the City's witnesses, the situation deteriorated when Dr. Dumas threw a paper containing the text of LSA R.S. 14:403 on the floor after Sergeant Alexander presented it to her, saying that she knew what the law said, but that she was not going to comply with it. On the other hand, Dr. Dumas's witnesses claim that Sergeant Alexander was arrogant and rude to everyone she encountered at the office that day.
Dr. Dumas stated that she had known earlier that morning that someone was trying to remove the student in question from the school without following School Board procedures, but that she thought the matter had been resolved. She said that she had been in a conference with a student and his parents just prior to Sergeant Alexander's arrival, and that Sergeant Alexander came into her office with two males, trapping her behind her desk. Thereafter, Dr. Dumas said, Sergeant Alexander waved papers in her face, but did not allow her to read those papers. Then, Sergeant Alexander simply told her that she was under arrest.
The trial judge in this case obviously believed the version of events presented by Dr. Dumas and her witnesses, as he found that Sergeant Alexander's sole purpose in going to the school was not to secure release of the student, but to arrest Dr. Dumas. The trial court's credibility finding on this issue cannot be reversed because it neither is contradicted by documents or objective evidence nor is so internally inconsistent or implausible that no reasonable factfinder would credit it. Accordingly, we affirm the trial judge's decision on liability.

DAMAGES
Asserting that the incident in question was "only minor and very brief," the City asserts in brief to this court that both the general and special damages awarded by the trial judge "grossly exceed the gravity of the incident."

*1006 General damages
The Louisiana Supreme Court recently discussed the standard of appellate review of a trial court's general damage award in Duncan v. Kansas City Southern Railway Co., XXXX-XXXX (La.11/03/00), 773 So.2d 670, as follows:
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms." Keeth v. Dept. of Pub. Safety & Transp., 618 So.2d 1154, 1160 (La.App. 2 Cir.1993). Vast discretion is accorded the trier of fact in fixing general damage awards. La. Civ.Code art. 2324.1; Hollenbeck v. Oceaneering Int., Inc., 96-0377, p. 13 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, 172. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260. As we explained in Youn:

Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
Id. at 1261.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. National Emergency Serv. Inc., 99-0934 (La.10/29/99), 747 So.2d 1085, 1089; Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
Id. at 13-14, 773 So.2d 683.
In the instant case, Dr. Dumas testified that she experienced great humiliation and embarrassment as a result of her arrest, caused at least partially by the fact that the arresting police officers insisted on "parading" her through the school and out the front door rather than complying with her request that she be taken out an easily-accessible back door. Immediately following her arrest, she attempted to explain the incident to the students of the school; nevertheless, she became the subject of false rumors and jokes and started receiving phone calls, causing her further humiliation and distress, Dr. Dumas said. The incident was later published in the Louisiana School Law Quarterly, meaning that Dr. Dumas's colleagues throughout the State of Louisiana became aware of her arrest and the filing of criminal charges against her.
The record supports the trial judge's finding that the consequences of the arrest were "horrendous" for Dr. Dumas. She testified to sleepless nights, hair loss, nervousness, rashes, crying spells, and jitters, which led her to seek psychiatric counseling. Because her confidence had been destroyed and because she was forced to miss so much work during the year following *1007 her arrest, Dr. Dumas testified that she was eventually required to take early retirement, despite the fact she was only 49 years old, as well as the fact that she had enjoyed her job and had never considered retirement prior to her arrest.
The City claims, however, that Dr. Dumas's claim that she was forced to take early retirement because she was unable to perform her duties as principal as a result of her arrest is not supported by the record because the only evidence was Dr. Dumas's own self-serving testimony. However, our review of the record reveals sufficient evidence to support the trial judge's implicit finding on this issue. In fact, Dr. Dumas's testimony on these issues was corroborated by the testimony of co-workers, her husband and her treating psychiatrist, Dr. Doris LeBlanc.
The City also claims that the trial judge abused his discretion when he awarded Dr. Dumas $100,000 in general damages, asserting that that amount is dramatically greater than general damages previously awarded in similar cases. In support of this argument, the State cites the following false arrest cases from this court: Dixon v. Winn-Dixie Louisiana, 93-1627 (La.App. 4 Cir. 5/17/94), 638 So.2d 306 ($50,000 to grocery shopper falsely arrested for shoplifting); Fisher v. Louisiana Department of Public Safety, 555 So.2d 626 (La.App. 4 Cir.1989) ($10,000 for false arrest and battery of store owner by police officer with no probable cause); Johnson v. Foti, 537 So.2d 232 (La.App. 4 Cir.1988) ($25,000 for plaintiff who had been imprisoned for 29 days); Thomas v. Winn Dixie Louisiana, Inc., 477 So.2d 925 (La.App. 4 Cir.1985) ($22,500 award to grocery shopper falsely detained for shoplifting); and Hernandez v. Schwegmann Giant Supermarkets, 464 So.2d 902 (La.App. 4 Cir.1985) ($23,000 award to grocery shopper falsely detained and arrested for shoplifting).
The City's argument ignores the fact that the Supreme Court's language in Duncan requires that this court determine whether the trial judge abused his vast discretion in assessing the amount of general damages before even considering other awards in other cases. Id. at 14, 773 So.2d 683. Our review of the record in this case convinces us that the trial judge did not abuse his vast discretion in awarding general damages in this case. Moreover, even if it were appropriate to consider awards in other similar cases, all but one of the cases cited by the City were decided more than a decade ago. More importantly, none of the plaintiffs in the cases cited experienced the type of long-term consequences experienced by Dr. Dumas in the instant case. Under the circumstances of this case, we find no merit in any of the City's arguments relative to the $100,000 general damage award.

Special damages
The City also claims that the trial judge improperly awarded Dr. Dumas $100,000 in lost wages. In order to prove entitlement to lost wages, a plaintiff bears the burden of proving that he would have been earning wages but for the incident in question. Boyette v. United Services Automobile Ass'n, XXXX-XXXX, p. 3 (La.04/03/01), 783 So.2d 1276, 1279.
Dr. Dumas testified that she took early retirement at the age of 49 from her job as principal at John F. Kennedy High school as a result of her arrest. In order to be eligible for early retirement, Dr. Dumas was required to pay $21,964.05. Moreover, she said, her annual school board salary just prior to her retirement was $63,930, while her retirement benefits are $46,008, a difference of $17,922.02 per year. Dr. Dumas also testified that she would probably have been promoted had she not retired, implying that she would *1008 have received an even greater salary. According to Dr. Dumas, she was required to use 42 days of annual leave prior to her retirement, resulting in a loss of at least $11,679. Finally, Dr. Dumas said that had she worked 30 years prior to her retirement, she would have been eligible for other benefits.
Dr. Melville Wolfson, who was qualified without objection as an expert in the field of actuarial science, presented testimony relative to an actuarial chart he prepared concerning Dr. Dumas's lost income. Considering the difference in Dr. Dumas's school board salary and her retirement benefits, Dr. Wolfson testified that Dr. Dumas's lost income between the date of her retirement in 1994 and the date of trial in 1999 totaled approximately $193,187, plus $12,510 in sick pay, $24,000 in pension contributions, and $9,680 in medical contributions. Dr. Wolfson also calculated Dr. Dumas's lost income from the date of trial until she reaches the age of 65, assuming that she does not work at all, at $463,929, even if she had never received another raise in salary. Given the record evidence relative to Dr. Dumas's lost income, we find no abuse in the trial judge's $100,000 award.

CONCLUSION
For the above and foregoing reasons, the trial court judgment is affirmed. All costs of this appeal are to be paid by the City.
AFFIRMED.